# EXHIBIT 1

Copy file

ADMINISTRATIVE SERVICES CONTRACT - WEEKLY WIRE PROGRAM
BETWEEN
BLUE CROSS AND BLUE SHIELD OF MICHIGAN
AND
BORROUGHS CORPORATION - GROUP #30527

This Contract, effective as of the 1st day of January, 1994, is between Blue Cross and Blue Shield of Michigan, a Michigan non-profit Corporation, whose address is 600 Lafayette East, Detroit, Michigan 48226, (BCBSM) and Borroughs Corporation, whose address is 302 N. Burdick, Kalamazoo, MI 49007, (Group), includes and incorporates any Schedules, Addenda, Exhibits and Amendments which are attached hereto, and supersedes any prior agreement between the parties regarding matters contained herein.

The intent of this Contract is to establish the criteria for eligibility of individuals for health care Coverage(s) provided by the Group; to describe health care Coverage(s) available to such individuals through the Group; to set forth the general responsibilities of BCBSM and the Group; and to set forth the financial responsibilities of the Group for health care Coverage(s) administered by BCBSM under this Contract.

THEREFORE, in consideration of their mutual promises, BCBSM and the Group agree as follows:

## ARTICLE I
## DEFINITIONS

For purposes of this Contract, defined terms are:

A.  "Amounts Billed" means the amount the Group owes in accordance with BCBSM's standard operating procedures for payment of Enrollees' claims.

B.  "Contract Year" means the Initial Term of this Contract and each Renewal Term. In the event of termination other than at completion of the Contract Year, a Contract Year means that period from the Effective Date or the most recent Renewal Date through the termination date.

C.  "Coverage(s)" means the health care benefits described in the Coverage Agreement, which is attached as Exhibit A.

D.  "Disputed Claim(s)" means Amounts Billed which are used to determine the Group's liability, but which the Group believes should not be so used.

E.  "Effective Date" means the date stated in Schedule A.

- 1 -

F.  "Employees" means current proprietors, employees, retirees, surviving spouses, and COBRA beneficiaries who are eligible and enrolled for Coverage(s). The New Hire Agreement is attached as Exhibit B.

G.  "Enrollees" means Employees and dependents of Employees who are eligible/enrolled for Coverage(s).

H.  "IBNR Claims" means Enrollees' claims which were incurred under this Contract, which will be paid by BCBSM after the expiration of this Contract, and for which the Amounts Billed are the Group's responsibility pursuant to provisions of this Contract.

I.  "Initial Term" means the period stated in Schedule A.

J.  "Payment Quarter" means each three (3) month period, commencing on the Effective Date and continuing during the Term(s) of this Contract.

K.  "Renewal Date" means the date stated in Schedule A.

L.  "Renewal Term" means a period commencing on the first (1st) day following the end of the Initial Term and each subsequent period as stated in Schedule A.

## ARTICLE II
### GENERAL RESPONSIBILITIES

A.  **STANDARDS**

   BCBSM shall administer Enrollees' health care Coverage(s) in accordance with the Coverage Agreement, BCBSM's standard operating procedures for comparable coverages offered under a BCBSM underwritten program, any operating manual provided to the Group, and this Contract. In the event of any conflict between the Contract and these standards, this Contract controls.

   BCBSM is not the named Plan Administrator or Plan Sponsor for purposes of the Employees Retirement Security Act of 1974 (ERISA) and its responsibilities are limited to the administration of health care Coverages pursuant to this Contract. The Group is responsible for communicating effective dates of Coverages to all newly hired and rehired Employees, all changes in Coverages and whether Coverages have been terminated for any reason, including nonpayment of amounts owed pursuant to this Contract, and the effective date of any such termination. This provision shall not, however, release BCBSM from other duties and responsibilities it may have under ERISA.

B. **CLAIMS**

BCBSM shall, except in the event of termination for Nonpayment/Partial Payment, administer Enrollee's covered claims which are incurred during the Term(s) of this Contract and shall pay these claims on the Group's behalf. BCBSM shall, following Normal Termination, and may, following Nonpayment/Partial Payment Termination, continue to process and pay IBNR Claims. Notwithstanding any of these Contract provisions, BCBSM shall have no obligation whatsoever as to claims which are incurred following termination of this Contract.

The Group shall reimburse BCBSM for all Amounts Billed including those made pursuant to BCBSM's "Good Faith" prescription drug policy. However, the Group may, in order to minimize any amounts incurred after an Enrollee's ineligibility, issuance of new Identification Cards, and/or Contract termination, collect and destroy invalid Cards.

C. **DISPUTE RESOLUTION**

The Group shall, within approximately sixty (60) days of receipt of a claims listing, notify BCBSM in writing with appropriate documentation of any Disputed Claim(s) and shall, upon request, execute any documents required for collection of amounts due from third parties. BCBSM shall promptly investigate and within a reasonable time, respond to such Claim(s). Additionally, BCBSM shall,

1) following the recovery of an amount from a third party, due to Worker's Compensation or other provider/program/party responsibility or

2) following BCBSM's determination that any other disputed amount is not the Group's liability or that an amount shown on a claims listing and invoice is incorrect,

credit the recovered or corrected amount, reduced by any Excess Loss payments relating to such Claim(s) or any amounts currently overdue, on a subsequent monthly invoice.

BCBSM, while processing Coverage(s) under this Contract, is subrogated to all rights of the Group/Enrollee relating to Disputed Claim(s) and is not obligated to institute or become involved in any litigation concerning such Claim(s).

D. **ENROLLMENT**

The Group shall, prior to the Effective Date of this Contract, notify BCBSM of Enrollees eligible and enrolled for Coverage(s) and shall, thereafter, promptly notify BCBSM of all changes in eligibility/enrollment according to procedures established by BCBSM. BCBSM shall have no obligation as to changes in eligibility/enrollment prior to proper notification. BCBSM shall continue to administer and pay and the Group shall continue to reimburse BCBSM for claims of Enrollees which were incurred through the last day of the month in which BCBSM had at least five (5) business days notice of Enrollee ineligibility.

E. **MEDICARE SECONDARY PAYER**

The Group will be responsible for determining whether any person should be covered under this Contract or under the Medicare Program so that BCBSM may properly determine whether the liability for payment of any Enrollee claim is primary or secondary under the Medicare Program. The Group agrees to indemnify and hold harmless BCBSM for any claims, demands, judgments, penalties or other liabilities arising out of the Group's failure to provide timely and accurate information in order for BCBSM to make any such determination.

F. **DISCLOSURE**

The Group shall disclose to Enrollees: the services being provided by BCBSM; the fact that BCBSM does not insure Enrollees' health Coverage(s) and, if BCBSM certificates are not used, the fact that Enrollees are not covered under BCBSM certificates; the party liable for benefits; the party liable for future changes in benefits; the fact that information concerning Enrollees may be reviewed by parties other than BCBSM; and any other matters mandated by law. Also, the Group shall, prior to issuance to Enrollees, submit such disclosure materials as well as all Enrollee materials regarding health Coverage(s) to BCBSM.

G. **STATUTORY AND CONTRACTUAL INTEREST**

BCBSM's enabling legislation and participating provider contracts may require the payment of interest to Enrollees and providers. Any interest required to be paid to Enrollees will be made in addition to and at the time of late payment of a satisfactory claim and to providers pursuant to contract.

The Group shall reimburse BCBSM for any interest paid if BCBSM did not pay the claim(s) due to: BCBSM's exercise of its contractual right to cease processing claims; the failure of the Group to timely notify BCBSM of Enrollees' eligibility; or specific instructions from the Group not to pay claims. BCBSM shall pay any interest otherwise incurred.

H.  **CONFIDENTIALITY**

The Group and BCBSM shall treat with confidentiality all information provided to one another under the terms of this Contract, including but not limited to information relating to specific Enrollees; shall use such information only to administer this Contract; and shall not release any information for any other purpose, except as required by law. The Group may, however, utilize information regarding overall claims experience for comparative rate quotations.

Further, the Group and BCBSM shall comply with all state and federal law determined applicable by BCBSM regarding access to, review of, and/or use of information, including but not limited to information relating to Enrollees.

## ARTICLE III
## FINANCIAL RESPONSIBILITIES

A.  **GENERAL OBLIGATIONS**

The Group shall immediately assume: all risks; all financial obligations, including but not limited to Amounts Billed, court costs and attorney's fees; and all other liabilities BCBSM may assume or which might otherwise attach with respect to processing Coverage(s) pursuant to this Contract. The Group shall make full payment and satisfaction to BCBSM for all amounts resulting from such risks, financial obligations and liabilities. Group responsibility shall not, however, include amounts resulting directly from any negligent processing.

B.  **SPECIFIC OBLIGATIONS**

The Group shall, for each Contract Year, pay BCBSM the total of the following amounts:

1.  Amounts Billed during the current Year.

2.  Prospective hospital reimbursement, representing funding by BCBSM to participating hospitals for Coverage(s) to be provided to Enrollees.

3.  The actual administrative charge.

4.  Any late payment charge.

5.  Any applicable statutory and contractual interest.

6.  Any cost transfer subsidies or surcharges ordered by the State Insurance Commissioner pursuant to 1980 P.A. 350.

7. Any other amounts which are the Group's responsibility pursuant to this Contract, including but not limited to risks/obligations/liabilities, deficit amounts relating to previous agreements, and deficit amounts relating to settlements.

## ARTICLE IV
## PAYMENT OF FINANCIAL RESPONSIBILITIES

A. **TIMELY PAYMENT AND REMEDIES**

All amounts determined under this Contract shall be timely paid.

The Group shall make Weekly payments by the Weekly payment day/date. Any increases or decreases in such payments shall be reflected in Weekly payments during the subsequent Payment Quarter(s). All other amounts owed shall be paid by the Group within ten (10) days of invoice receipt or by BCBSM with the settlement or invoice.

BCBSM shall promptly notify the Group of any overdue Weekly payments, add statutory and contractual interest, any cost transfer subsidies/surcharges, if applicable, as well as a cumulative late payment charge to any overdue amounts and may, if any Weekly payment is more than two (2) business days overdue or any invoiced amount is more than five (5) days overdue, cease administering/paying claims retroactive to the last date for which payment was made.

The payment day, the payment dates for the first Payment Quarter(s), the statutory and contractual interest rate, and the late payment charge are stated in Schedule A. However, notwithstanding the late payment charge stated, such charge shall not exceed the maximum permitted by law.

B. **SCHEDULED PAYMENTS**

The Group shall, during each Payment Quarter, Weekly prepay the pro rata cost of Amounts Billed for that Quarter, the pro rata cost of the estimated administrative charge for that Contract Year and the amount BCBSM determines is necessary to maintain the prospective hospital reimbursement funding for that Contract Year.

The amount owed relating to claims for each Quarter is based on the Weekly average Amounts Billed during the prior available twelve (12) months, as adjusted for costs and utilization. Amounts Billed are shown on the monthly claims listings provided on approximately the twentieth (20th) of each month. These listings indicate: charges for each hospital/facility claim and the monthly aggregate Amounts Billed related to such claims;

Amounts Billed for other claims; credits for Disputed Claim(s) which have been resolved; and any adjustments. The estimated administrative charge is derived by multiplying the administrative fee by the estimated number of Employees. This charge shall be revised following thirty (30) days written notice of a verified ten (10) percent change in enrollment and/or of any adjustment of Coverage(s) during the Contract Year.

Estimated payment amounts, the estimated number of Employees, the administrative fee per Employee, the schedule and method of payment, and covered lines of business are stated in Schedule A.

C. **SCHEDULED ADJUSTMENTS AND SETTLEMENTS**

1. **AMOUNTS BILLED**

   BCBSM shall, approximately sixty (60) days after the close of each Quarter, notify the Group of any adjustment in the amounts owed during the next payment Quarter and shall provide a detailed settlement showing Amounts Billed to and owed by the Group during the prior available Quarter as well as any deficit amounts.

2. **ADMINISTRATIVE FEE AND CHARGE**

   BCBSM shall: approximately thirty (30) days prior to renewal, notify the Group of any adjustment of the administrative fee. Such adjustment becomes effective on the Renewal Date and, except for specified changes in Coverage(s), remains constant for that Renewal Term; and, approximately one hundred and twenty (120) days after the close of each Contract Year, provide a settlement showing the estimated and the actual administrative charge.

D. **POST TERMINATION**

Notwithstanding other Contract provisions, the Group's obligation to pay amounts incurred under this Contract survives termination and the Group shall timely pay all amounts owed.

1. **FIRST SIX MONTHS**

   BCBSM shall: for the first three (3) months, continue to provide a quarterly notification. Amounts owed during these months shall be determined and paid in the same manner as before termination. However, the monthly administrative charge for this period shall be based upon the fee and the estimated number of Employees at termination; and for months four (4) through six (6), invoice the Group monthly based on Amounts Billed during the prior available month.

Additionally, BCBSM shall, for each of the six (6) months, issue a monthly claims listing and, approximately sixty (60) days after the close of this period, provide a final settlement. If the balance resulting from this settlement is a credit and exceeds the estimated outstanding liability for Amounts Billed, BCBSM shall return the difference between the balance and the liability. If the balance is less than such liability, the Group shall pay the difference.

2. **THEREAFTER**

BCBSM shall, approximately fourteen (14) months following termination, provide an invoice stating Amounts Billed during the prior months, as adjusted for any amount retained at the end of the first six months, and stating any other amounts due. BCBSM shall, thereafter, invoice the Group monthly for any Amounts Billed and any other amounts owed.

## ARTICLE V
## TERM, TERMINATION, AMENDMENT, AND LAW

A. **TERM**

The Initial Term of this Contract is the period stated in Schedule A. Thereafter, this Contract shall renew automatically on the Renewal Date unless, prior to that Date, either party provides thirty (30) days written termination notice.

B. **TERMINATION**

1. **NORMAL**

Either party may, upon the first (1st) day of the month following thirty (30) days written notice, terminate this Contract as to claims incurred after termination.

2. **NONPAYMENT/PARTIAL PAYMENT**

Notwithstanding any other Contract provision, in the event that the Group fails to timely pay any amounts owed, BCBSM may, after five (5) days notice, terminate this Contract.

C. **AMENDMENT**

This Contract may be amended at any time, but only by written agreement of the parties.

D. **LAW**

This Contract is entered into in the State of Michigan and shall be construed according to the laws of Michigan.

**BCBSM:**

By: _Stephen R Hartnett_ (Signature)

Name: _STEPHEN R HARTNETT_ (Print)

Title: _ACCOUNT EXECUTIVE_

Date: _12/7/93_

By: _Mary Ditzel_ (Signature)

Name: _MARY DITZEL_ (Print)

Title: _RATING SPECIALIST II_

Date: _12/15/93_

**THE GROUP:**

By: _Thomas G Wilsh_ (Signature)

Name: _Thomas G Wilsh_ (Print)

Title: _Vice President Finance_

Date: _12/22/93_

By: _____ (Signature)

Name: _____ (Print)

Title: _____

Date: _____

MD/td:620

# OPERATING BALANCE ADDENDUM - WEEKLY WIRE

This Addendum, effective the 1st day of January, 1994, between Blue Cross and Blue Shield of Michigan (BCBSM) and Borroughs Corporation (Group), is incorporated into the Administrative Services Contract for a Weekly Wire Program (ASC), effective January 1, 1994.

BCBSM and the Group terminated a prior agreement as of the Effective Date of the ASC. This Addendum sets forth certain obligations relating thereto.

Therefore, in consideration of their mutual promises, the parties agree as follows:

## ARTICLE I
### DEFINITIONS

1. "Actual Operating Balance" means the surplus or deficit payable or chargeable to the Group pursuant to the Final Settlement of the prior agreement.

2. "Estimated Operating Balance" means the amount used to determine the initial liabilities under this Addendum since the Actual Operating Balance cannot be determined prior to the Effective Date of the ASC.

3. "Prior Agreement IBNR Claims" means claims which were incurred while the prior agreement was in effect, but which will not be processed by BCBSM until after the Effective Date of the ASC.

## ARTICLE II
### RESPONSIBILITIES

Pursuant to the Operating Balance, BCBSM shall credit any surplus due or the Group shall reimburse any deficit amount owed. The Group shall pay Prior Agreement IBNR Claims as if these claims were incurred under the ASC.

1. **TIMELY PAYMENT AND REMEDIES**

    Provisions stated in the ASC relating to timely payment and remedies shall apply to payments under this Addendum.

- 1 -

2. **ESTIMATED LIABILITIES**

   BCBSM shall, prior to the Effective Date of the ASC, determine the Estimated Operating Balance. The Estimated Operating Balance is stated in Schedule A and payment of any credit or deficit shall be as there stated.

3. **ACTUAL LIABILITIES**

   BCBSM shall, approximately one hundred and twenty (120) days after the Effective Date of the ASC, provide a final Settlement showing the Estimated and the Actual Operating Balance. Payment of any credit/deficit resulting from this final Settlement shall be as stated in the Settlement.

**BCBSM:**

By: _____ (Signature)

Name: STEPHEN R HARTNETT (Print)

Title: ACCOUNT EXECUTIVE

Date: 12/7/93

Sign Here →

By: _____ (Signature)

Name: MARY DITZEL (Print)

Title: RATING SPECIALIST II

Date: 12/15/93

**THE GROUP:**

By: _____ (Signature)

Name: Thomas G Welsh (Print)

Title: Vice President Finance

Date: 12/22/93

By: _____ (Signature)

Name: _____ (Print)

Title: _____

Date: _____

OBAWW

- 2 -

# EXCESS LOSS ADDENDUM - WEEKLY WIRE PROGRAM

This Addendum, effective the first day of January, 1994 between Blue Cross and Blue Shield of Michigan (BCBSM) and Borroughs Corporation (Group), is incorporated into the Administrative Services Contract for a Weekly Wire Program (ASC), effective January 1, 1994, describes the Excess Loss coverage(s) provided by BCBSM and states the financial responsibilities of the Group for such coverage(s).

Therefore, in consideration of their mutual promises, BCBSM and the Group agree as follows:

## ARTICLE I
### DEFINITIONS

Article I (Definitions) of the ASC applies to this Addendum and additional defined terms are:

A.  "Aggregate Excess Loss" coverage means that BCBSM shall reimburse the Group for any Amounts Billed which exceed the Aggregate Excess Loss Attachment Point, as reduced by any credits relating to Specific Excess Loss coverage.

B.  "Attachment Point" means that number which separates BCBSM's liability and the Group's liability for Amounts Billed. The Aggregate Excess Loss Attachment Point is equal to a predetermined dollar amount multiplied by the average number of Units during the Contract Year. The Aggregate and/or Specific Attachment Point(s) per Unit, as applicable, is stated in Schedule A.

C.  "Specific Excess Loss" coverage means that BCBSM shall reimburse the Group for any Amounts Billed which exceed the Specific Excess Loss Attachment Point.

D.  "Unit" means an "Employee" plus such person's eligible/enrolled dependents.

# ARTICLE II
## RESPONSIBILITIES

BCBSM shall provide the Excess Loss coverage(s) stated in Schedule A on those lines of business stated in Schedule A. Excess Loss coverage(s) applies solely to Amounts Billed during a Contract Year, as shown on claims listings.

The Group shall, for each Contract Year, pay premiums for Excess Loss coverage(s).

A. **TIMELY PAYMENT AND REMEDY**

The Group shall monthly prepay premiums owed under this Addendum and shall timely pay, within ten (10) days of invoice receipt, any other amounts currently owed. BCBSM may, whenever any payment is more than five (5) days overdue, discontinue Excess Loss coverage(s) retroactive to the last prepaid date.

BCBSM shall pay any amount due the Group with the invoice or settlement.

B. **MONTHLY PREMIUM(S)**

BCBSM shall, for each month of a Contract Year, provide an invoice stating the Excess Loss premium(s). Premiums for both Aggregate and Specific Excess Loss coverages shall be calculated as follows: the monthly premium per Unit multiplied by the estimated number of Units. The estimated number of Units may be adjusted based on a ten (10) percent change in enrollment or an addition or deletion of lines of business. The monthly premium per Unit and the estimated number of Units are stated in Schedule A.

C. **RENEWAL TERM ADJUSTMENTS**

BCBSM shall, approximately thirty (30) days prior to the Renewal Date, recalculate the monthly premium(s) for the coming Contract Year. Additionally, BCBSM and the Group may, by mutual agreement, adjust the Aggregate and/or Specific Excess Loss Attachment Point(s). All recalculations and adjustments shall be stated in Schedule A - Renewal Term and shall be effective on the Renewal Date.

D. **CREDITS AND SETTLEMENTS**

BCBSM shall, on monthly invoices provided under the ASC, credit the Group for any amounts due pursuant to Specific Excess Loss coverage and, approximately one hundred and twenty (120) days after the end of the Contract Year, provide a settlement showing premiums paid and actually owed and reimburse the Group for any amount due pursuant to Aggregate Excess Loss coverage.

BCBSM may, however, set off any amount owed by the Group under the ASC, including this Addendum, against any amounts due the Group under this Addendum.

If the premium balance shows a deficit, the Group shall pay this amount.

**BCBSM:**

By: _____
(Signature)

Name: STEPHEN R HARTNETT
(Print)

Title: ACCOUNT EXECUTIVE

Date: 12/7/93

By: _____
(Signature)

Name: MARY DITZEL
(Print)

Title: RATING SPECIALIST II

Date: 12/15/93

**THE GROUP:**

By: _____
(Signature)

Name: Thomas G Walsh
(Print)

Title: Vice Pres - Finance

Date: 12/5/93

By: _____
(Signature)

Name: _____
(Print)

Title: _____

Date: _____

ELAWW

- 3 -